UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                        CASE NO: 2:18-cr-88-FtM-38MRM

JACK W. TURTLE

_____

## **OPINION AND ORDER**[1]

Before the Court is Defendant Jack W. Turtle's Motion to Dismiss (Doc. 36), Turtle's Memorandum in Support (Doc. 38), and the Government's response (Doc. 43). The Court heard oral argument on January 4, 2019, and the Motion is now ripe.

The Government charged Turtle with seven counts of selling American alligator eggs in violation of the Lacey Act, 16 U.S.C. § 3371 *et seq.*, predicated on the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* (Doc. 1). Turtle is a member of the Seminole Tribe of Florida who resides on the Brighton Seminole Indian Reservation. (Doc. 1). The Government alleges that Turtle sold 3,996 eggs collected on the Reservation between June 19, 2015, and July 30, 2016, for $19,980. (Doc. 43). Turtle now moves to dismiss the indictment.

Fed. R. Crim. P. 12 allows a defendant to challenge an indictment as defective for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). When considering a pretrial

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

motion to dismiss, "a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006). The 11th Circuit does not permit district courts to dismiss an indictment based on facts outside the indictment, even if those facts are undisputed. United States v. Salman, 378 F.3d 1266, 1267-68 (11th Cir. 2004). But a district court must "dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense." United States v. Coia, 719 F.2d 1120, 1123 (11th Cir. 1983). The Court thus assumes the allegations in the Information are true and will determine whether they implicate Turtle for the charged crimes as a matter of law.

The Information charging Turtle tracks the language of the ESA and the Lacey Act. The Lacey Act prohibits knowingly selling wildlife when, in the exercise of due care, the defendants should have known the wildlife was taken in violation of state or federal law. 16 U.S.C. § 3372(a)(1), § 3373(d)(2). The ESA, in turn, empowers the Secretary of the Interior to promulgate regulations to protect threatened species and prohibits the violation of any such regulation. 16 U.S.C. § 1533(d), § 1538(a)(1)(G). 50 C.F.R. § 17.11(h) lists the American alligator as threatened due to similarity in appearance with other listed crocodilians, and a regulation promulgated under the ESA prohibits the taking and sale of American alligator eggs unless done in accordance with the laws and regulations of the State or Tribe in which the taking and sale occur. 50 C.F.R. § 17.42(a)(2).

Turtle does not attack the charging language in the Information. He instead focuses on the authority of the U.S. and Florida governments to impose their laws on members of the Seminole Tribe. Turtle argues the Tribe has traditional sovereign hunting and fishing rights never relinquished by treaty, and any statutes restricting those rights

are void and unenforceable. (Doc. 38). The Government concedes that the Tribe has implicit usufructuary rights but questions whether those rights include the right to sell wildlife. If they do, the Government argues that the Tribe still must comply with the ESA based on two alternative theories: that Congress abrogated Turtle's right to collect alligator eggs when it passed the ESA and the Lacey Act, and that, if not, the ESA and Lacey Act are still enforceable against the Tribe as reasonable and necessary conservation measures.

### A. The Seminole Tribe of Florida's Sovereignty

The Seminole Tribe of Florida is a federally recognized Indian Tribe. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34,863, 34,866 (July 23, 2018). Its reservations were established in 1911 by President Taft through Executive Order No. 1379. The parties agree there is no treaty between the Tribe and the United States relevant here, but "Indian reservations created by statute, agreement, or executive order normally carry with them the same implicit hunting rights as those created by treaty." *United States v. Dion*, 476 U.S. 734, 745 n.8 (1986).

Turtle argues that Congress' "authority to regulate Native Tribes…is firmly rooted in the principle that the Tribes relinquished some sovereign rights by treaty," and since the Seminole Tribe of Florida has no treaty with the United States, its members "can't be controlled or regulated by a foreign entity." (Doc. 38). At the hearing on the Motion, Turtle's Counsel repeatedly argued that the U.S. Government's only legitimate method of regulating Indian tribes is through treaties. But in fact, Congress abandoned the practice of signing treaties with Indian tribes in 1871. 25 U.S.C. § 71 ("No Indian nation or tribe

3

within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty[.]"). Since then, Congress has dealt with Indian tribes "through the legislative and not through the treaty-making power." *Elk v. Wilkins*, 112 U.S. 94, 107 (1884). "It is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of the Indian tribes." *Washington v. Confederated Bands & Tribes of Yakima Indian Nations*, 439 U.S. 463, 501 (1979); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) ("Indian tribes are domestic dependent nations that exercise inherent sovereign authority…As dependents, the tribes are subject to plenary control by Congress." (internal quotations and citations omitted)). Congress clearly has the authority to limit the rights of tribal members through legislation even in absence of a treaty. Before the Court decides whether Congress has done so here, it must determine whether Turtle's conduct fell within the scope of his tribal rights.

### B. The Scope of the Tribe's Usufructuary Rights

"As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress. These rights need not be expressly mentioned in the treaty." *Dion*, 467 U.S. at 738 (citations omitted). Turtle asserts that the Seminoles retain their traditional hunting, gathering, and fishing rights, but his Memorandum of Law is silent on a traditional right to sell wildlife. (Doc. 38). For its part, the Government concedes that the Tribe has implicit hunting and fishing rights, but not the right to sell wildlife.

The Government cites several cases that address whether tribes' treaty-guaranteed usufructuary rights included the right to sell parts of the animals they hunted.

Those cases hinged on whether the tribes traditionally engaged in the sale of wildlife parts. For example, both the Eighth and Ninth Circuits have held that tribal members did not have treaty rights to sell eagle feathers because their tribes historically deplored the sale of eagle parts and thus would not have understood the treaties to reserve such a right. *United States v. Dion*, 752 F.2d 1261, 1264 (8th Cir. 1985); *United States v. Top Sky*, 547 F.2d 486, 487-88 (9th Cir. 1976). But when tribes historically relied on the trade of animal parts, courts have interpreted usufructuary rights to include sale and barter. *United States v. Fiddler*, No. 2:10-CR-52-RLH, 2011 WL 2149510, at *3-4 (D. Nev. Mar. 11, 2011), *report and recommendation adopted*, No. 2:10-CR-52-RLH, 2011 WL 2148853 (D. Nev. June 1, 2011); *United States v. Bresette*, 761 F. Supp. 658, 660-62 (D. Minn. 1991).

There are no treaties to interpret here, but "[e]xecutive orders, no less than treaties, must be interpreted as the Indians would have understood them 'and any doubtful expressions in them should be resolved in the Indians' favor.'" *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995) (quoting *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970)). When determining the rights associated with executive-order reservations, courts "must consider the executive orders themselves, the circumstances surrounding their creation, and the history of the Indians for whom they were created." *Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334, 342 (9th Cir. 1996).

The Court first turns to the language of the executive order that established the Tribe's reservations:

> It is hereby ordered that the following described lands in the State of Florida be, and they are hereby withdrawn from settlement, entry, sale, or other disposal, and set aside as a reservation for the Seminole Indians in

5

> southern Florida, provided that this withdrawal is subject to any existing valid rights or claims of any persons[.]

Exec. Order No. 1379. The order then lists the metes and bounds of six parcels of land that became Seminole reservations. *Id.* Executive Order 1379 thus does not expressly limit the Tribe's implied hunting and fishing rights. Nor do the circumstances surrounding the order or the history of the Seminoles. In fact, in the early 20th century, alligator hides and eggs were important trade goods for tribal members who bartered with white settlers. Harry A. Kersey Jr., *Pelts, Plumes, and Hides: White Traders among the Seminole Indians, 1890-1930*, 51 FLA. HIST. Q. 250, 254 (1973). Resolving any doubts in the Tribe's favor, the Court finds that the Seminole's usufructuary rights include the right to sell alligator eggs gathered from the reservation. The Court must next determine whether Congress has abrogated that right.

### C. Abrogation of the Tribe's Usufructuary Rights

While Congress has plenary power over Indian tribes, it must demonstrate a "clear and plain intent" when abrogating Indian rights. *Dion*, 476 U.S. at 739. "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 739-40. Turtle is charged with violations of the Lacey Act, predicated on violations of the ESA. If either of these acts abrogated his right to sell alligator eggs, the Government's case survives. As with treaties and executive orders, courts construe statutes "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

Congress explicitly declined to abrogate Indian rights when it passed the Lacey Act, which states,

> Nothing in this chapter shall be construed as…repealing, superseding, or modifying any right, privilege, or immunity granted, reserved, or established pursuant to treaty, statute, or executive order pertaining to any Indian tribe, band, or community[.]

16 U.S.C. § 3378(c)(2); *see also* United States v. Brown, 777 F.3d 1025, 1034 (8th Cir. 2015) (The Lacey Act "itself makes clear that Congress did *not* intend to abrogate Indian rights."). The Government's case for abrogation thus hinges on the ESA.

In *Dion*, the Eighth Circuit, after examining the legislative history and surrounding circumstances, held that the ESA did not abrogate Indian treaty rights. Dion, 752 F.2d at 1270. The Supreme Court reversed on other grounds and left ESA abrogation unresolved. Dion, 476 U.S. at 746. The Government urges the Court to follow the reasoning in United States v. Billie, 667 F. Supp. 1485 (S.D. Fla. 1987), which held that Congress abrogated the Seminoles' right to hunt Florida panthers by passing the ESA. Billie, 667 F. Supp. at 1490-92. The *Billie* court considered the legislative history and found the *Dion* test satisfied by the ESA's "general comprehensiveness, its nonexclusion of Indians, and the limited exceptions for certain Alaskan natives." Id. at 1490. The *Billie* decision has proven controversial, receiving both criticism and praise from legal scholars. *Compare* Robert Laurence, *The Abrogation of Indian Treaties by Federal Statutes Protective of the Environment*, 31 Nat. Resources J. 859 (1991) *with* Conrad A. Fietland, *The Endangered Species Act and Indian Treaty Rights: A Fresh Look*, 13 Tul. Envtl. L.J. 45 (1999).

The 93rd Congress enacted the ESA in 1973 based on House Bill 37 and Senate Bill 1983. The legislative history of these bills does not shed much light on Congress'

intent on Indian treaty rights, so the *Billie* court turned to hearings on predecessor bills considered by the 92nd Congress, where abrogation was discussed. *Billie,* 667 F. Supp. at 1490-92. But this evidence, even assuming it is probative to the intent of the 93rd Congress, is equivocal. For example, in a hearing on House Bill 13081, an Interior Department official advised that American Indians "enjoy treaty-secured hunting and fishing rights" and that if Congress wished to extinguish those rights, it must do so expressly.[2] *Predatory Mammals and Endangered Species: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation of the Comm. on Merchant Marine and Fisheries,* 92d Cong., 2d Sess. 144 (1972). The official explained that Congress could preserve tribal rights by remaining silent on the issue. *Id.*

The Interior Official's comments also demonstrate why the ESA's inclusion of an express exception for Alaskan natives is not necessarily evidence that Congress intended to abrogate the rights of other indigenous people. He stated,

> Although American Indians enjoy treaty-secured hunting and fishing rights over areas in which endangered species are found, no such rights are recognized for Aleuts and Eskimos. Moreover, section 3 of the Alaska Native Claims Act extinguished any claims they may have asserted to immunity from Federal hunting and fishing laws.

*Id.* Congress ultimately included in the ESA a limited exception for takings by "any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska" and residents "of an Alaskan native village." 16 U.S.C. § 1539(e). Perhaps Congress limited this exception to Alaskan natives in recognition of their unique reliance on endangered species for cultural and subsistence purposes. Or perhaps Congress believed Alaskan natives had

---

[2] Although the Supreme Court ultimately proved the Interior Department official wrong in *Dion*, his comment was a reasonable interpretation of then-prevailing precedent.

a unique need for an exception because they lacked the treaty rights enjoyed by Indians in other states.

All in all, interpreting the ESA liberally in favor of the Seminoles, the Court does not find clear and convincing evidence that Congress chose to abrogate the Tribe's usufructuary rights.

### D. Regulation of the Tribe's Usufructuary Rights

The Court turns to the Government's final argument that Congress can still regulate the Tribe's rights with reasonable and necessary conservation measures. In *Puyallup Tribe v. Washington Game Dep't*, 391 U.S. 392, 398 (1968), the Supreme Court stated the following:

> The manner of fishing (and hunting), and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians. The appropriate standards requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure . . . and that its application to the Indians is necessary in the interest of conservation.

*Antoine v. Washington*, 420 U.S. 194, 207 (1975) (internal citations and quotations omitted). The Government argues the *Puyallup* test, which the Supreme Court devised for state statutes, should also apply to federal laws. The Court agrees. In fact, because Congress has plenary power over Indian tribes, the scrutiny applied to its policy decisions need not be as rigorous as in *Puyallup*. Here, the Government has sufficiently shown that regulating the selling of American alligator eggs is for reasonable and necessary conservation and does not discriminate against the Seminole Tribe.

In 1980, the Office of the Solicitor for the Department of the Interior issued an opinion to address whether the ESA "applies to Native Americans in their exercise of any

hunting or fishing rights pursuant to a treaty with the United States or pursuant to a statutory or aboriginal right, or an executive order." Dep't of the Interior, Office of the Solicitor, Opinion Letter on Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights, 87 Interior Dec. 525, 525-526 (Nov. 4, 1980). The upshot of the opinion is that the ESA is enforceable against Indians because it is not incompatible with Indian treaty rights. The Interior Solicitor relied mainly on the Supreme Court's three Puyallup decisions "concerning a chronic dispute between a number of tribes and the State of Washington over treaty hunting and fishing rights." Id. at 528. The Solicitor summarized the Court's holdings:

> Those cases established that (1) the State, pursuant to its police power, has the right to regulate off-reservation fishing where the regulation is reasonable and necessary for conservation, Puyallup Tribe v. Washington Game Department, 391 U.S. 392, 398 (1968) (Puyallup I); (2) any regulations promulgated by the State as reasonable and necessary for conservation purposes may not discriminate against Native Americans who hold valid treaty hunting and fishing rights, Washington Game Department v. Puyallup Tribe, 414 U.S. 44, 48 (1973) (Puyallup II); (3) reasonable and necessary State conservation regulations may apply to Indian hunting and fishing on the reservation as well as off. Puyallup Tribe v. Washington Game Department, (Puyallup III), 433 U.S. 165, 171 (1977).

Id. The Solicitor then concluded that "Indian treaty rights do not include the right to take species which are endangered or threatened with extinction" and that "the statutes and regulations which protect those species are clearly reasonable and necessary for the conservation of those species." Id. at 529.

The American alligator "was first classified as endangered throughout its range in 1967 due to concern over poorly regulated or unregulated harvests." Endangered and Threatened Wildlife and Plants; Reclassification of the American Alligator to Threatened Due to Similarity of Appearance Throughout the Remainder of Its Range, 52 Fed. Reg.

21,059 (June 4, 1987) (codified at 50 C.F.R. pt. 17). Thanks to Federal and State protection, the species "recovered rapidly in many parts of its range," and it was reclassified during the 1970s and 80s. *Id.* The American alligator is now listed as a threatened—but still protected—species because of its similar appearance to other listed crocodilians. *Id.* at 21,060. The Interior Department's Fish and Wildlife Service summarized the effect of the reclassification:

> This action formally recognizes that the American alligator is no longer biologically threatened or endangered, but supports a need for continued Federal controls on taking and commerce to insure against excessive taking and to continue necessary protections to the American crocodile (Crocodylus acutus) in the U.S. and foreign countries, and other endangered crocodilians in foreign countries.

*Id.* Although the Interior Department reclassified the American alligator, it did so with the understanding that federally enforced laws and regulations remained in place to protect against a recurrence of the excessive taking of the American alligator, which prompted the original listing. *Id.* at 21,062. The codification of the Interior Department's rule change, 50 C.F.R. § 17.42(a), shows a reasonable and necessary measure aimed at (1) protecting endangered and threatened crocodilians and (2) preserving the biological security of the American alligator.

Also, applying the protected status of the American alligator to the Seminole Tribe is non-discriminatory and necessary for conservation. Congress took care to protect the American alligator from, among other things, the overselling of their hides. And protecting the reptile worked because it led to a resurgence in population. The American alligator has remained federally protected for the past thirty plus years. Requiring the Seminole Tribe to recognize the American alligator's protected status is necessary to the continued

and successful conservation efforts to protect the health and safety of the species (and other crocodilians).

In short, although Congress has not exercised its authority to abrogate Turtle's right to sell eggs, those rights are not unlimited. The Government can enforce reasonable and necessary conservation measures against members of the Seminole Tribe, and 50 C.F.R. § 17.42(a) is such a measure.

Accordingly, it is now

**ORDERED:**

Defendant Jack W. Turtle's Motion to Dismiss (Doc. 36) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this 4th day of February, 2019.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record